Filed 10/20/25; certified for publication 11/4/25 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KAREN L. WILLIS, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> THE WALT DISNEY COMPANY et al. <br><br> Defendants and Appellants. | D084434 <br><br><br> (Super. Ct. No. 37-2023-00040565-CU-BT-CTL) |

APPEAL from an order of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Reversed and remanded.

Jassy Vick Carolan, Jean-Paul Jassy, and Jordyn Ostroff for Defendants and Appellants.

Mirch Law Firm, Kevin J. Mirch, and Marie C. Mirch for Plaintiff and Respondent.

I

INTRODUCTION

Karen L. Willis, doing business as Harlem West Entertainment, is married to the cofounder and original lead singer of the Village People, a

well-known band that has had numerous hit songs over the decades. Willis sued the Walt Disney Company, Walt Disney World Entertainment, and a Disney employee, Bradley Ross (collectively, Disney), alleging Disney violated the Unfair Competition Law (Bus. & Prof. Code, § 17200 et seq.; UCL) and committed fraud by deciding not to book the Village People for future musical concerts at Disney venues and making false or misleading statements to the band's agents about the possibility of hiring the band for such performances.

Disney responded by filing a special motion to strike the complaint under the anti-SLAPP statute,[1] Code of Civil Procedure section 425.16.[2] The trial court denied the motion, finding Disney failed to carry its initial burden of establishing that the anti-SLAPP statute protected the alleged conduct giving rise to Willis' complaint.

Disney appeals the order denying its anti-SLAPP motion. Disney argues its selection of which musical acts to showcase at its public concerts, as well as its communications with the Village People about the band's potential participation in the concerts, is protected conduct under the anti-SLAPP statute. We agree. Therefore, we reverse the order denying the anti-SLAPP motion and instruct the trial court to assess whether Willis has shown that her claims have at least minimal merit.

---

[1]    SLAPP is an acronym that refers to a Strategic Lawsuit Against Public Participation. (*Geiser v. Kuhns* (2022) 13 Cal.5th 1238, 1242 (*Geiser*).)

[2]    Further undesignated statutory references are to the Code of Civil Procedure.

II

BACKGROUND

The facts in the first two subparts of this background section are taken from the complaint and the evidence submitted in connection with the anti-SLAPP motion. (*Edward v. Ellis* (2021) 72 Cal.App.5th 780, 784.)

A. *Background*

Willis is the wife of Victor Willis, who cofounded and served as the original lead singer for the musical group known as the Village People.[3] The group was formed in 1977. It is an acclaimed band renowned for popular hit songs including "Macho Man," "In the Navy," and "YMCA." According to the complaint, Willis is the "sole proprietor and exclusive (worldwide) licensee of the Village People trademark for purposes of live performances."

For several years prior to 2017, a version of the Village People comprised of a subset of the band's original members—but not Victor—gave live annual performances at Disney venues. Willis refers to this incarnation of the band as Sixuvus and we adopt her nomenclature for the sake of consistency. In 2017, Willis and Victor executed a settlement with Can't Stop Productions, the owner of the Village People trademark, to resolve certain lawsuits relating to the trademark. Under the settlement, Sixuvus lost the ability to use the Village People trademark. Meanwhile, Willis and Victor were permitted to re-form a new version of the Village People that included Victor as a member and excluded the former members of Sixuvus.

Disney hired the newly reconstituted Village People to perform at Walt Disney World in Florida on May 11 and 12, 2018. According to Willis, former Sixuvus members—aggrieved by their effective expulsion from the band—

---

[3] Because Karen Willis and Victor Willis share the same surname, we refer to Victor by his first name to avoid confusion. No disrespect is intended.

3

urged their fans to boycott the performances and submit complaints about the performances to Disney. Nonetheless, the performances went forward as planned. Willis claims they were "jam packed and turned out fantastic."

Nonetheless, after the performances, Willis sent a notice of intent to bring suit to Bradley Ross, the Talent Booking Director for Disney Parks & Resorts. She threatened to bring a variety of claims against Disney arising out of the Walt Disney World performances unless Disney invited the band back for a "do over performance." Willis alleged Disney failed to prevent Sixuvus members and fans from harassing the Village People, failed to assign proper security to Willis and the Village People, interfered with Willis when she tried to mix and control live audio for the audience, and intentionally paid the Village People with a check made payable to Sixuvus, which temporarily delayed the Village People's payment. Willis sent follow-up letters to Ross about these issues, but he ignored them.

B. *The Complaint*

In September 2023, Willis, proceeding in propria persona, filed a complaint against Disney in the Superior Court for the County of San Diego. The complaint alleged Disney instituted a secret "ban or 'do not book' edict" on Village People performances after the Walt Disney World performances. The complaint also claimed Disney and several agents of the band engaged in conversations about Disney potentially hiring the band for future performances, but Disney's statements during those conversations were false or misleading in light of the company's undisclosed booking ban.

The complaint identified three specific examples in which Disney and the band's agents discussed possible future engagements. First, in August 2022, an agent of the band contacted Ross and "inquir[ed] about the booking of Village People [sic] for Disney's Flower Power Concert Series." In

4

response, "Ross was very coy" and "refused to either commit to the booking or consider the booking." Second, in September 2022, an agent of the band called Ross about the Flower Power Concert Series proposal. On the call, "Ross was very 'cold' on Village People and 'didn't seem interested in engaging any talks' about ever booking the group again." Third, in August 2023, an agent of the band contacted Ross to discuss a possible booking in 2024, and Ross feigned interest by stating, "if Village People performs in the area, let [me] know and 'I'll check them out.'" According to the complaint, Disney "jerk[ed] [the] agents around," "engaged in a charade," and "intended to defraud [the agents] by inducing reliance upon [Disney's] representations."

Based on these allegations, the complaint asserted causes of action against Disney for violations of the UCL, fraud, civil conspiracy, and declaratory relief. As we will discuss, the complaint alleged that Disney's refusal to consider the booking proposals, i.e., the booking ban, as well as Disney's false or misleading communications with the band's agents about future engagements, amounted to unlawful, unfair, and/or fraudulent conduct. The complaint prayed for $400,000 in compensatory damages, $20 million in punitive damages, a judicial declaration that Disney's conduct violated the UCL, injunctive relief, and an award of attorney fees.

C. *The Anti-SLAPP Motion*

Disney answered the complaint and then filed a special motion to strike the complaint under the anti-SLAPP law. Disney claimed the complaint was based on Disney's "decisions regarding whether and how to negotiate with and/or to book Village People for musical performances at [its] venues." In Disney's view, these acts were protected under the anti-SLAPP law's catchall provision, section 425.16, subdivision (e)(4). Disney also argued Willis could not establish a probability of success for any of her causes of action.

Together with its anti-SLAPP motion, Disney filed a declaration from Ross, the Disney employee responsible for hiring celebrity talent at Disney venues. Ross averred he attended one of the Village People's performances at Walt Disney World in 2018, and it was "underwhelming." Nevertheless, Ross alleged Disney never instituted a booking ban against the band. In fact, shortly before Willis filed this case, Willis and a Disney-owned and -operated affiliate signed a contract for the band to perform at a Thanksgiving Day parade, which went forward as planned. Disney attached the contract for the parade performance, the contract for the Walt Disney World performances, and Willis' notice of intent to bring suit as exhibits to the Ross declaration.

Willis opposed Disney's anti-SLAPP motion. She argued all of her causes of action arose from Disney's alleged discussions with the band's agents and its related concealment of the booking ban—not the booking ban itself—and Disney failed to carry its burden of establishing that this conduct was protected. Relying largely on the allegations of the complaint, Willis also claimed she was likely to prevail on her causes of action.

Willis filed a declaration in opposition to the anti-SLAPP motion. She averred, "all the allegations in the complaint are true." She also stated that the Village People agents who approached Disney about future engagements "tru[ly] and correctly communicated" to her the responses that they received from Disney regarding the band's proposals.

Disney filed a reply in support of its anti-SLAPP motion and evidentiary objections to the Willis declaration.

After holding two hearings on the anti-SLAPP motion, the trial court issued a minute order denying the motion. The court found the conduct giving rise to Willis' complaint implicated an issue of public interest, but the conduct did not further, or participate in, a public conversation about that

6

issue. Therefore, the court found Disney did not meet its initial burden of establishing that Willis' causes of action arose from protected conduct under the catchall provision of the anti-SLAPP statute. Because the court found Disney did not meet this burden, the court did not rule on Disney's evidentiary objections or address whether Willis had a probability of success on her causes of action.[4]

III

DISCUSSION

A. *Anti-SLAPP Statute*

"Enacted by the Legislature in 1992, the anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.] To that end, the statute authorizes a special motion to strike claims 'arising from any act of [a] person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' " (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 883–884 (*Wilson*).)

"A court evaluates an anti-SLAPP motion in two steps. 'Initially, the moving defendant bears the burden of establishing that the challenged

---

[4] After the parties filed their appellate briefs, Willis belatedly requested augmentation of the appellate record to include several additional trial court filings made by Willis, as well as Disney's responses to those filings. The filings at issue include a legal brief styled as an "addendum" to Willis' brief opposing Disney's anti-SLAPP motion, a second legal brief styled as a "sur-rebuttal" to an argument raised in Disney's anti-SLAPP motion, a so-called "objection" to the reply brief Disney filed in support of its anti-SLAPP motion, and a request to clarify a statement made by Willis during the anti-SLAPP hearing. These filings, which were not considered by the trial court when it issued its anti-SLAPP order, are irrelevant to the disposition of the present appeal. Therefore, we deny Willis' motion to augment the record.

7

allegations or claims "aris[e] from" protected activity in which the defendant has engaged. [Citations.] If the defendant carries its burden, the plaintiff must then demonstrate its claims have at least "minimal merit." ' [Citation.] If the plaintiff fails to meet that burden, the court will strike the claim. Subject to certain exceptions not relevant here, a defendant that prevails on a special motion to strike is entitled to attorney fees and costs." (*Wilson, supra,* 7 Cal.5th at p. 884.) Because the trial court found Disney did not satisfy its initial burden, we focus our discussion on the first step of the analysis.

At the initial step, the moving defendant must "identify the activity each challenged claim rests on and demonstrate that that activity is protected by the anti-SLAPP statute. A 'claim may be struck only if the speech or petitioning activity *itself* is the wrong complained of, and not just evidence of liability or a step leading to some different act for which liability is asserted.' [Citation.] To determine whether a claim arises from protected activity, courts must 'consider the elements of the challenged claim and what actions by the defendant supply those elements and consequently form the basis for liability.' [Citation.] Courts then must evaluate whether the defendant has shown any of these actions fall within one or more of the four categories of ' "act[s]" ' protected by the anti-SLAPP statute." (*Wilson, supra,* 7 Cal.5th at p. 884.) "If conduct that supplies a necessary element of a claim is protected, the defendant's burden at the first step of the anti-SLAPP analysis has been carried, regardless of any alleged motivations that supply other elements of the claim." (*Id.* at p. 892; see also *Ojjeh v. Brown* (2019) 43 Cal.App.5th 1027, 1038 (*Ojjeh*) ["our task at the first stage of the anti-SLAPP

8

analysis is to examine the challenged conduct without regard to the allegations of improper motive"].)[5]

The first three categories of protected acts are codified in section 425.16, subdivision (e)(1)–(3), and they "shield statements and writings made in connection with official proceedings or in public on matters of public interest." (*Wilson, supra*, 7 Cal.5th at p. 884, fn. 4.)  The fourth category, codified in section 425.16, subdivision (e)(4), is the category relevant to this case.  It defines protected acts to include "*any … conduct* in furtherance of the exercise of the constitutional right of petition or the constitutional right of free speech in connection with a public issue or an issue of public interest." (§ 425.16, subd. (e)(4), italics added.)  It serves as a " 'catchall' provision meant to round out the statutory safeguards for constitutionally protected expression." (*FilmOn.com Inc. v. DoubleVerify Inc.* (2019) 7 Cal.5th 133, 144 (*FilmOn*); see *Geiser, supra*, 13 Cal.5th at p. 1243 [section 425.16, subdivision (e)(4), is a "catchall provision in the statute's enumeration of ' "act[s] in furtherance of a person's right of petition or free speech" ' "].)  The catchall provision "extends the protection of the anti-SLAPP statute beyond actual instances of free speech to all conduct in furtherance of the exercise of that right when undertaken in connection with a public issue or issue of public interest." (*Ojjeh, supra*, 43 Cal.App.5th at p. 1036.)

---

[5]    At points, Willis argues that Disney failed to demonstrate that "the gravamen of the complaint" arises from conduct protected by the anti-SLAPP statute.  However, the Supreme Court has repudiated the outmoded "gravamen" standard, which "risk[s] saddling courts with an obligation to settle intractable, almost metaphysical problems about the 'essence' of a cause of action that encompasses multiple claims." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1011.)  The correct legal standard applicable to the first step of the anti-SLAPP analysis is set forth above.

In *FilmOn*, the Supreme Court articulated a two-part test for courts to apply when determining whether conduct is entitled to protection under the statute's catchall provision. (*FilmOn, supra*, 7 Cal.5th at pp. 149–150; see *Geiser, supra*, 13 Cal.5th at p. 1243.) Under the first step, we must "ask what 'public issue or [ ] issue of public interest' the [challenged activity] in question implicates." (*FilmOn*, at p. 149, quoting § 425.16, subd. (e)(4).)[6] An activity implicating a public issue "generally 'concern[s] a person or entity in the public eye[,] … conduct that could directly affect a large number of people beyond the direct participants[,] … or a topic of widespread, public interest.' " (*Geiser*, at p. 1248; see *Weinberg v. Feisel* (2003) 110 Cal.App.4th 1122, 1132–1133 ["some attributes of [an] issue which make it one of public … interest" include the fact that the issue is "of concern to a substantial number of people" or has "been the subject of extensive media coverage"].) When we identify the public issue implicated by the challenged speech or activity, we consider the content of any speech and the context in which the challenged speech or activity arises. (*FilmOn*, at p. 149; *Geiser*, at pp. 1252–1254.)

Under the second step, "we ask what functional relationship exists between the [challenged activity] and the public conversation about some matter of public interest." (*FilmOn, supra*, 7 Cal.5th at pp. 149–150.) This ensures there is " 'some degree of closeness' between the challenged [activity] and the asserted public interest." (*Id.* at p. 150.) " '[I]t is not enough that the [activity] refer to a subject of widespread public interest; the [activity] must in some manner itself contribute to the public debate.' " (*Ibid.*) When

---

6    "The statutory phrases '*public issue*' and an '*issue of public interest*' seem to refer to the same thing: it is difficult to imagine a 'public issue' that is not an 'issue of public interest,' and vice versa. … We simplify by referring interchangeably to 'public issues' and 'issues of public interest.' " (*Dubac v. Itkoff* (2024) 101 Cal.App.5th 540, 548.)

10

deciding whether this standard is met, "[w]e are not concerned with the social utility of the [activity] at issue, or the degree to which it propelled the conversation in any particular direction; rather, we examine whether [the] defendant—through public or private speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id.* at p. 151.) At this step, we must consider the context in which the defendant engaged in the alleged injury-producing conduct. (*Id.* at pp. 149–152.)

We review de novo whether a defendant has satisfied its initial burden of establishing that the conduct giving rise to the lawsuit is entitled to protection under the anti-SLAPP law. (*Geiser, supra*, 13 Cal.5th at p. 1250.)

B. *Anti-SLAPP Prong One: The Complaint Arises from Protected Conduct*

Under the first prong of the anti-SLAPP law, we must determine whether the injury-producing conduct giving rise to Willis' complaint is protected conduct under the catchall provision of the anti-SLAPP statute. Our analysis proceeds in three stages. First, we identify the alleged conduct that forms the basis of Disney's liability. Next, we determine whether that alleged conduct implicates a public issue. Finally, we analyze the functional relationship between the alleged conduct and the relevant public issue.

1. *The Conduct Giving Rise to the Causes of Action*

Our preliminary task is to identify what alleged conduct by Disney supplies the elements of Willis' causes of action and forms the basis for Disney's liability. (See *Wilson, supra*, 7 Cal.5th at p. 884; see also *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1063.)

We begin with the UCL claim. The scope of the UCL is "broad." (*Cel-Tech Communications, Inc. v. Los Angeles Cellular Telephone Co.* (1999) 20 Cal.4th 163, 180.) "The UCL prohibits, and provides civil remedies for, unfair competition, which it defines as 'any unlawful, unfair or fraudulent business

11

act or practice.' " (*Kwikset Corp. v. Superior Court* (2011) 51 Cal.4th 310, 320.) " 'Because [the UCL] is written in the disjunctive, it establishes three varieties of unfair competition—acts or practices which are unlawful, or unfair, or fraudulent.' " (*Cel-Tech*, at p. 180.)

Disney argues the UCL cause of action arises both from Disney's alleged booking ban and its communications with the band's agents about the possibility of future Village People performances at Disney venues. Willis reads her complaint more narrowly. She contends her UCL cause of action arises solely from Disney's "evasive and misleading … interactions with [the] talent agents representing the Village People," not the booking ban. We conclude Disney's reading of the complaint is correct.

As the parties agree, the complaint clearly alleges Disney violated the UCL by making false and/or misleading statements implying that Disney might hire the band for future concerts and other musical performances at its theme parks and other venues. As noted, Willis alleges Disney repeatedly "lead[] the agents on" by feigning interest in the band or, at minimum, leaving open the possibility of future engagements with the band—all of which was a "charade" or "game[]" in light of the undisclosed booking ban.[7]

However, at various points, the complaint additionally alleges a UCL violation based on the booking ban itself. For example, the introduction of

_____

[7] Willis' appellate brief confirms her causes of action arise, in part, from Disney's affirmative misrepresentations to the band's agents during their discussions about future musical performances. For example, Willis claims the "alleged conduct underlying each claim [consists of] three private conversations between two people—Disney's agent and each of [the] Village People's agents." She also claims Ross was "evasive and misleading" during these conversations, made "misrepresentations to [the] agents of [the] Village People," and "misrepresented his intentions when he said he needed to see [the] Village People perform."

12

the complaint states, "The denial of booking opportunities for Village People by Disney prevented the group from fairly competing for open performance slots at Disney."  Elsewhere, under a heading captioned, "Facts/Unfair Business Practices," the complaint alleges, "[An agent of the band] made contact with Bradley Ross … about the booking of Village People … Ross refused to … consider the booking. …. [¶] … [¶] [T]he refusal to so much as consider the booking … constitutes unfair business practices because it prevented [sic] Village People's ability to fairly compete for a performance slot at Disney. [¶] … [¶] Disney went wrong and violated California's UCL by outright refusing to seriously consider the group for an engagement …."[8] The complaint also states, "[A] ban, or at minimum, a 'do not book' edict was in effect on Village People at Disney … such ban or 'do not book edict' was wrongful and unjustified."  These allegations illustrate that the UCL claim is based on Disney's alleged communications with the band's agents *and* its so-called booking ban.

The civil conspiracy claim rests on the same dual set of allegations. "[C]ivil conspiracy is not itself a tort, but a theory which ' "fastens liability on those who agree to the plan to commit the wrong as well as those who actually carry it out." ' " (*Spencer v. Mowat* (2020) 46 Cal.App.5th 1024, 1029, fn. 2.)  "The elements of liability under conspiracy are: (1) formation and operation of the conspiracy; (2) wrongful conduct in furtherance of the conspiracy; and (3) damages arising from the wrongful conduct." (*Id.* at p. 1037.)  "In determining the acts on which the causes of action against [Disney] are based, we focus on the tortious acts in which [it] [is] alleged to have conspired," not the acts evidencing its participation in the conspiracy. (*Id.* at p. 1040.)  Here, the complaint asserts Disney conspired to injure Willis

---

8      These allegations were incorporated into the UCL cause of action.

"through the unlawful acts alleged herein, i.e., unfair business practices." As discussed, those unfair business practices consisted both of Disney's allegedly misleading statements to the band's agents and its alleged booking ban.

Likewise, Willis' declaratory relief cause of action arises from the same conduct underpinning her UCL claim. Under a heading for the declaratory relief cause of action, the complaint states, "An actual controversy now exists between Plaintiff and Defendants concerning whether Defendants have committed unfair business practices." Further, the prayer for relief seeks "a declaration by [the trial] [c]ourt that the behavior complained of by Plaintiff constitutes violations of the UCL (Business and Professions Code, § 17200)." Thus, the declaratory relief cause of action arises from the same allegations underpinning her UCL claim—namely, Disney's allegedly misleading statements to the band's agents and its alleged booking ban.

As for the fraud cause of action, "[t]he elements of fraud are: (1) a misrepresentation (false representation, concealment, or nondisclosure); (2) knowledge of falsity (or scienter); (3) intent to defraud, i.e., to induce reliance; (4) justifiable reliance; and (5) resulting damage." (*Robinson Helicopter Co., Inc. v. Dana Corp.* (2004) 34 Cal.4th 979, 990.) Here, our focus is on the element of misrepresentation. In the portion of the complaint asserting a fraud cause of action, the complaint states Disney perpetrated fraud when it "beat around the bush with numerous Village People agents." Elsewhere, the complaint states, "Defendants intended for the agents to rel[y] on [its] representations," and the agents "justifiably relied on Disney's representations." There is no indication the fraud cause of action rests on the underlying booking ban. Thus, unlike the preceding claims, the fraud claim rests solely on Disney's alleged statements to the band's agents, which were false or incomplete due to the alleged booking ban.

14

## 2. *FilmOn Step One: The Public Issue Implicated by the Conduct*

Having identified the alleged conduct giving rise to the causes of action, we now proceed to the first step of the *FilmOn* framework and consider whether the conduct implicates a public issue for purposes of the catchall provision of the anti-SLAPP statute. (*FilmOn, supra*, 7 Cal.5th at p. 149.) The trial court found the conduct implicates a public issue and neither party disputes this determination on appeal.[9] Like the trial court and the parties, we agree that Disney's alleged conduct implicates a public issue.

All of the alleged conduct relates to whether Disney will hire the Village People to perform their well-known music for the general public at Disney's popular theme parks. According to Willis, the Village People is a "world-famous" band that has had numerous popular hit songs since its inception five decades ago. Disney, of course, is a mass media and entertainment conglomerate with near-universal brand recognition. Further, the parties do not dispute that a significant number of attendees listen to the music concerts Disney stages at its theme parks. Indeed, in the complaint, Willis describes the Village People's 2018 Walt Disney World performances as "jam packed" with attendees. Because Disney and the Village People are both squarely in the public eye, the conduct alleged in the complaint implicates a public issue.[10] (See *FilmOn, supra*, 7 Cal.5th at pp. 145, 149.)

---

[9] Willis states, "step one of the FilmOn inquiry is not at issue," a concession that the alleged conduct implicates a public issue.

[10] On appeal, Disney requests judicial notice of four media articles discussing the present lawsuit to show the case has garnered extensive media coverage and, therefore, Disney's alleged conduct implicates a public issue. (*Geiser, supra*, 13 Cal.5th at p. 1248.) All of the articles postdate the trial court's order denying the anti-SLAPP motion.

15

### 3. *FilmOn Step Two: The Functional Relationship Between the Conduct and the Public Issue*

Finally, under the second *FilmOn* step, we must evaluate the functional relationship that exists between the defendant's alleged speech or conduct and the public conversation about a matter of public interest. (*FilmOn, supra*, 7 Cal.5th at pp. 149–150.) In other words, we must decide whether the defendant's alleged speech or conduct " 'participat[es]' in or furthers—some public conversation" about a public issue.[11] (*Id.* at p. 151.)

We begin with the alleged booking ban, which gives rise, at least in part, to three of Willis' causes of action (the UCL, conspiracy, and declaratory relief causes of action). The phrase "booking ban" is, in effect, a shorthand way of referring to Disney's selection of which musical acts will perform at

---

"Reviewing courts generally do not take judicial notice of evidence not presented to the trial court. Rather, normally 'when reviewing the correctness of a trial court's judgment, an appellate court will consider only matters which were part of the record at the time the judgment was entered.' " (*Vons Companies, Inc. v. Seabest Foods, Inc.* (1996) 14 Cal.4th 434, 444, fn. 3.) We deny Disney's request for judicial notice because none of the articles existed at the time the trial court issued its anti-SLAPP ruling and, in any event, the articles are unnecessary to the disposition of the appeal. (See *County of Humboldt v. McKee* (2008) 165 Cal.App.4th 1476, 1501, fn. 16 [declining to take notice of documents filed in trial court after entry of judgment]; *Hotels Nevada v. L.A. Pacific Center, Inc.* (2006) 144 Cal.App.4th 754, 763, fn. 3 [declining to take notice of declarations and hearing transcript that postdated trial court's ruling].)

11 Willis claims Disney forfeited its arguments relating to the second step of the *FilmOn* inquiry by failing to brief the issue in the trial court. We reject this argument. In its trial court briefing, Disney cited the *FilmOn* decision and other relevant appellate case law, argued its alleged conduct was protected under the catchall provision of the anti-SLAPP statute, and claimed its purported selection of musical acts was conduct "in furtherance of [its] constitutionally protected exercise of free speech." Disney adequately preserved its argument for our consideration.

the music concerts it produces at its popular theme parks and related venues. Viewed through this lens, there can be no reasonable dispute that Disney's selection of the musical acts that will (or will not) perform at its live concerts has the requisite " 'degree of closeness' " with a public issue, as the anti-SLAPP law demands, because it directly dictates the music that will be played on the Disney stage. (*FilmOn, supra*, 7 Cal.5th at p. 150.)

In this regard, we find *Symmonds v. Mahoney* (2019) 31 Cal.App.5th 1096 (*Symmonds*) to be persuasive. In *Symmonds*, a rock-and-roll singer terminated all of the members of his band and rehired everyone except the drummer. (*Id.* at pp. 1100–1101.) The drummer filed an unlawful discrimination claim against the singer, who responded by filing an anti-SLAPP motion. (*Id.* at p. 1101.) The *Symmonds* court determined the singer satisfied his burden of demonstrating that the cause of action arose from protected conduct under the anti-SLAPP statute. (*Id.* at pp. 1105–1112.) As the court explained, " '[m]usic, as a form of expression and communication, is protected under the First Amendment,' " and "acts that 'advance or assist' the creation and performance of artistic works are acts in furtherance of the right of free speech for anti-SLAPP purposes" under the law's catchall provision. (*Id.* at pp. 1105–1106.) According to the court, a "singer's selection of the musicians that play with him both advances and assists the performance of the music, and therefore is an act in furtherance of his exercise of the right of free speech." (*Id.* at p. 1106; see also *id.* at p. 1109 [singer's "selection of a drummer was conduct 'in connection with ... an issue of public interest' "].)

*Hunter v. CBS Broadcasting Inc.* (2013) 221 Cal.App.4th 1510 (*Hunter*), is another instructive case. In *Hunter*, a male weather anchor sued CBS Broadcasting for unlawful age and gender discrimination after two local CBS television stations hired younger female weather anchors to fill vacant

17

anchor positions.  (*Id.* at pp. 1514–1515.)  CBS filed an anti-SLAPP motion, but the trial court denied the motion under the first anti-SLAPP prong.  (*Id.* at pp. 1515–1518.)  On appeal, the *Hunter* court reversed this finding and concluded the complaint arose from protected conduct under the anti-SLAPP law's catchall provision.  (*Id.* at pp. 1520–1527.)  The court determined the conduct giving rise to the claims "consist[ed] of CBS's decisions about whom to hire as the on-air weather anchors" for its prime time newscasts.  (*Id.* at p. 1521.)  " '[R]eporting the news' [citation] and 'creat[ing] ... a television show' both qualify as 'exercise[s] of free speech.' "  (*Id.* at p. 1521.)  Further, " '[a]n act is in furtherance of the right of free speech if the act helps to advance that right or assists in the exercise of that right.' "  (*Ibid.*)  Therefore, the *Hunter* court reasoned, "CBS's selections of its … weather anchors, which were essentially casting decisions regarding who was to report the news on a local television newscast, 'helped advance or assist' both forms of First Amendment expression," and were entitled to anti-SLAPP protection.  (*Ibid.*)

Applying these legal principles here, we conclude Disney's selection of musical acts is within the scope of conduct protected by the catchall provision of the anti-SLAPP statute.  As noted, music is a form of expression and communication protected by the First Amendment.  (*Symmonds, supra*, 31 Cal.App.5th at p. 1105; see *Ward v. Rock Against Racism* (1989) 491 U.S. 781, 790.)  Further, Disney's selection of musical acts to perform at its theme park concerts contributed to the public discussion about a public issue. Disney's selection of musical acts was "essentially [a] casting decision[]" about which musical acts would perform for the public—and what music would be played—at the company's theme parks under the imprimatur of Disney.  (*Hunter, supra*, 221 Cal.App.4th at p. 1521.)  Because this conduct furthered the public discourse on a public issue, it can reasonably be said to

18

have been undertaken "in furtherance" of the exercise of a protected form of expression and "in connection with" a public issue—specifically, whether the world-famous Village People would perform their well-known music at Disney's popular theme parks. (§ 425.16, subd. (e)(4).)

We now consider whether the anti-SLAPP statute protects Disney's communications with the Village People's agents about potentially booking the band to perform at its upcoming concerts. As discussed, Willis alleges Disney acted coy during conversations with agents of the band, yet Disney never ruled out the possibility of booking the band and requested an opportunity to hear the band perform live. We conclude Disney's statements to the band's agents during these discussions, like its ultimate selection of musical acts, constituted protected conduct. Indeed, any producer of a large-scale concert intended for a vast public audience must negotiate with prospective talent as an antecedent step to booking and later showcasing the talent on stage. Thus, Disney's conversations with the band's agents about potentially booking the band can reasonably be viewed as promoting, or furthering, the public discourse about Disney's concerts, the musical acts that would perform at them, and the music that would be played during them.

Willis claims Disney's statements are not protected under the catchall provision because Disney made the statements during private conversations with the band's agents. Because a court must consider the context of the defendant's conduct when deciding whether it is protected, the private nature of the conduct can be a relevant consideration at the second step of the *FilmOn* analysis. (*FilmOn, supra*, 7 Cal.5th at pp. 143–146.) However, even conduct in a private setting can receive protection under the catchall clause, so long as it concerns a public issue. The *FilmOn* court itself made this point when it held that a court must "examine whether a defendant—through

19

public *or private* speech or conduct—participated in, or furthered, the discourse that makes an issue one of public interest." (*Id.* at p. 151, italics added; see *Wilson, supra*, 7 Cal.5th at p. 903 ["private communications may qualify as protected activity in some circumstances"]; *Terry v. Davis Community Church* (2005) 131 Cal.App.4th 1534, 1546 ["subdivision (e)(4) applies to private communications concerning issues of public interest"].) The private nature of the alleged conduct simply "makes heavier [the defendant's] burden of showing that, notwithstanding the private context, the alleged [conduct] nevertheless contributed to discussion or resolution of a public issue for purposes of subdivision (e)(4)." (*Wilson*, at p. 904.)

*Ojjeh, supra*, 43 Cal.App.5th 1027, illustrates this point. In *Ojjeh*, the defendants solicited and obtained an investment from the plaintiff to produce a documentary film about a refugee crisis in Syria. (*Id.* at pp. 1032–1033.) The documentary was not completed, and the plaintiff asserted claims against the defendants based on allegations that they made false statements to him when they solicited his investment. (*Id.* at pp. 1033–1034.) The defendants filed an anti-SLAPP motion, which the trial court denied under the first prong of the anti-SLAPP statute. (*Id.* at p. 1035.) The *Ojjeh* court reversed. After observing that the reporting of news is a protected speech activity and the Syrian refugee crisis is an issue of public interest (*id.* at p. 1036), the *Ojjeh* court concluded the defendants' solicitation of investment funds for the never-completed documentary was conduct in furtherance of the exercise of free speech in connection with a public issue (*id.* at pp. 1040, 1042–1044). Although the conduct occurred during private conversations between the parties, the parties participated in those private "discussions to make a feature documentary film for a public audience." (*Id.* at p. 1043.) "[D]espite being incomplete when the complaint was filed, the proposed

20

documentary was speech activity intended for 'the public sphere' [citation], and defendants' work thereon constituted an 'attempt to participate in a larger public discussion[.]' " (*Id.* at pp. 1043–1044.) Further, the *Ojjeh* court concluded that the "defendants' efforts to secure funding for the documentary's production was functionally related to the advancement of its message, as … that funding was necessary for production, postproduction, promotion, and distribution of the film." (*Id.* at p. 1044.)

Similarly, the alleged false or misleading statements at issue here were made by representatives from Disney, a ubiquitous media and entertainment company, to representatives of the Village People, a well-known band, to identify potential musical acts for the concerts Disney intended to produce for a wide public audience at its popular theme parks. Stated differently, the communications were preliminary steps towards the production of a concert or series of concerts in "the public sphere." (*FilmOn, supra*, 7 Cal.5th at p. 153.) Further, the communications between the Disney representatives and the Village People representatives were functionally related to the concerts because, as the producer of the concerts, Disney needed to hire or retain musical acts like the Village People to sing or perform at its concerts. In short, the communications directly determined whether, and under what circumstances, the Village People would be permitted to perform their music for the public on the Disney stage. These communications "participated in, or furthered, the discourse" about a public issue. (*FilmOn,* at p. 151.)

For all these reasons, we conclude Disney satisfied its initial burden of demonstrating that the complaint arises from protected activity under the catchall provision of the anti-SLAPP statute. (§ 425.16, subds. (b)(1), (e)(4).)

21

C. *Anti-SLAPP Prong Two:  The Trial Court Must Determine Whether Willis Established That Her Causes of Action Have Minimal Merit*

The trial court found Disney did not satisfy its initial burden of demonstrating that Willis' causes of action arose from protected conduct. Therefore, it did not consider Disney's evidentiary objections or determine whether Willis demonstrated her causes of action have minimal merit.

Disney urges us to decide these issues for the first time on appeal.  We decline Disney's request.  Instead, we will pursue " 'the more prudent course' by remanding the matter to the trial court to make [these] determination[s] in the first instance.' " (*Ojjeh, supra*, 43 Cal.App.5th at p. 1044, quoting *Hunter, supra*, 221 Cal.App.4th at p. 1527; see also, e.g., *Bowen v. Lin* (2022) 80 Cal.App.5th 155, 163 [reversing anti-SLAPP denial order and remanding matter for trial court to consider evidentiary objections and conduct prong two analysis]; *Symmonds, supra*, 31 Cal.App.5th at p. 1113 [same]; *Greco v. Greco* (2016) 2 Cal.App.5th 810, 827 [same]; *Cross v. Cooper* (2011) 197 Cal.App.4th 357, 392 [same].)

IV

DISPOSITION

The order denying the anti-SLAPP motion is reversed and the matter is remanded for further proceedings on the motion.  Appellants are entitled to their appellate costs.

McCONNELL, P. J.

WE CONCUR:


O'ROURKE, J.


CASTILLO, J.

22

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| KAREN L. WILLIS,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>THE WALT DISNEY COMPANY et al.<br><br>    Defendants and Appellants. | D084434<br><br>(Super. Ct. No. 37-2023-00040565-CU-BT-CTL)<br><br><br>ORDER CERTIFYING OPINION FOR PUBLICATION |

THE COURT:

The opinion in this case filed October 20, 2025 was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

MCCONNELL, P. J.

Copies to:  All parties